IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| MARK DRABANT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 08-3057 |
| | ) | |
| FASTENAL CORPORATION and | ) | |
| BAUER CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

# OPINION

JEANNE E. SCOTT, U.S. District Judge:

This matter comes before the Court on Defendant Bauer Corporation's (Bauer) Motion for Summary Judgment (d/e 43) (Bauer Motion). Plaintiff Mark Drabant fell off a stepladder (Ladder) designed and manufactured by Bauer. He brought this personal injury action against Bauer, alleging products liability and negligence.[1] Amended Complaint (d/e 32). Bauer asks for summary judgment because Drabant has no evidence that the Ladder was unreasonably dangerous or that Bauer breached the

---

[1] Drabant also brought claims against co-defendant Fastenal Corporation. The claims against Fastenal Corporation have been dismissed. Text Order entered September 24, 2008.

1

standard of care in designing or manufacturing the Ladder. The Court agrees. The Motion, therefore, is allowed.

STATEMENT OF FACTS

In approximately 1996, Bauer designed and manufactured the Ladder. The Ladder was an extra heavy duty eight-foot stepladder made of fiberglass, steel, and aluminum. The Ladder was a typical stepladder that unfolded into an "A" frame shape, with steps on one side, back support legs on the other side, and two folding cross-bars, called spreader bars or spacer bars, that unfolded horizontally when the Ladder was set up. The Ladder met the ANSI standard for an extra heavy duty ladder and was rated to hold up to 300 pounds.[2] The Ladder was purchased by an unidentified person. Ten years later, the Ladder was at the Dominion Power Plant located in Kincaid, Illinois (Plant). At some point in time, an unidentified subcontractor had left the Ladder at the Plant.

On February 5, 2006, Drabant was working at the Plant. Drabant used the Ladder that day. Drabant intended to climb the Ladder to inspect a defective sprinkler head. Drabant set up the Ladder on a steel grate under

---

[2]The Court takes judicial notice that ANSI stands for American National Standards Institute.

the sprinkler. Bauer's counsel asked Drabant in his deposition if the grate was wet where Drabant set up the Ladder. Drabant said, "Not in that area." <u>Response to Motion for Summary Judgment (d/e 45) (Drabant Response)</u>, Exhibit A, <u>Deposition of Mark Drabant (Drabant Deposition)</u>, at 32. Drabant explained, "The grating was wet right to the north of it [the sprinkler head] as it was spraying back that way." <u>Id.</u> Drabant then started to climb the Ladder. Drabant weighed 230 pounds at that time. According to Drabant, when he reached the fifth step he heard a loud pop. Drabant stated that the Ladder became unstable and he fell and suffered injuries. After the fall, Drabant noticed that one of the spreader bars was separated from the back support leg. The spreader bar had been attached with a steel roll-clinched rivet (Rivet). The Rivet had become unclinched and allowed the spreader bar to become detached from the back support leg. Drabant then brought this action against Bauer.

In discovery, Drabant produced an expert report by Christopher Hahin, P.E. Hahin opined that the Rivet was not appropriate for the task of holding the spreader bar in place. Hahin opined that the Rivet was not strong enough to withstand the stresses placed on it when the Ladder was used on slippery, or low friction surfaces. <u>Drabant Response</u>, Exhibit H,

3

<u>Failure of Horizontal Spreader Bar Rivets in a Bauer Corp. Type IA Industrial Ladder, Revised Investigative Report, dated September, 2008 (Hahin Report)</u>, at 11. The level of friction is measured by a "coefficient of friction" between the two surfaces that are touching, in this case between the feet of the Ladder and the steel grate. A lower coefficient of friction means that there is less friction between the two surfaces. See <u>Id.</u>, at 11, 16-17.

The amount of friction between the Ladder's feet and the floor on which the Ladder was erected would affect the amount of force applied to the Rivet. As a person would climb the Ladder, he or she would push the Ladder's feet down and create friction between the Ladder's feet and the floor, and this friction would tend to keep the feet in place. If the level of friction between the feet and the floor was low, however, the front and back feet of the Ladder would not grip the floor as much. As a result, the feet (and, hence, the front steps and the back support legs of the Ladder) would tend to slide apart as a person would climb the Ladder. See <u>Id.</u>, at 11.

The spreader bars resist the tendency of the front steps and back support legs to slide away from each other on low friction surfaces. This resistance places stress on the rivets that fasten the spreader bars to the legs.

Hahin opined when the Ladder was used on surfaces on which the coefficient of friction was .175 or below, the rivets used by Bauer were not strong enough to withstand the stress and would wear prematurely and eventually fail. Id., at 24. Hahin selected .175 because the ANSI standard for extra heavy duty ladders is based on a minimum coefficient of friction of .175 between the surface and the feet of the ladder. Id., at 16. Hahin opined that a solid steel bolt and nut should be substituted for the Rivet. He opined that a steel bolt could withstand the stress that could occur when the Ladder was used on low friction surfaces. Id., at 25-26. Hahin stated in his deposition that he found no ladders on the market that used a bolt to attach spreader bars. Bauer Motion, Exhibit B, Deposition of Christopher Hahin (Hahin Deposition), at 131-32, 137. Rather, Hahin agreed that the rivet design used by Bauer was the common and pervasive design in the ladder industry. Id., at 92-95.

With respect to the incident on February 5, 2006, Hahin opined that the Rivet was already worn from prior use. Hahin assumed that the steel grate on which Drabant set up the Ladder was wet and slippery. He assumed that the friction between the Ladder's feet and the wet grate was negligible. Hahin Report, at 11. Thus, as Drabant climbed the Ladder,

5

Hahin opined that the Ladder's feet did not grip the grate, but started to slide away from each other, putting stress on the Rivet. Hahin opined that when Drabant climbed to the fifth step, the worn Rivet finally failed, the Ladder became unstable, and Drabant fell. Id., at 26-27.

In his deposition, Hahin explained that the Ladder met the ANSI standard for extra heavy duty ladders, but he believed that the ANSI standard assumed a minimum coefficient of friction during use that was too high. Hahin thought the standard should assume that such ladders would be used on more slippery surfaces. He stated that, if he could re-write the standard, he would reduce the minimum coefficient of friction in the standard from .175 to .05. Hahin Deposition, at 139-42.

Bauer's counsel and Hahin had the following colloquy in which counsel asked Hahin whether he believed to a reasonable degree of engineering certainty that the Ladder was unreasonably dangerous:

> Q. Having heard your statement here, would it be fair to say that while you have opinions as to why this rivet failed, you have no opinions that you are prepared to assert to a reasonable degree of engineering certainty as to whether or not the ladder in design was unreasonably dangerous and defective?
>
> A. I believe that the ladder manufacturer should have known what these forces were in a variety of environments. That's what I'm stating. I'm not, I'm not saying their product is

unreasonably dangerous, but what I am saying is in certain circumstances this is a very vulnerable connection and is apt to fail.

Q. All right. So you're not saying that the design is unreasonably dangerous, putting it simply?

A. In some, in, probably in defined circumstances you're right, it's not.

Q. It's only in the circumstances of where it's used on iron grating?

A. That's a good example.

Q. Because you think the coefficient of friction on iron grating is so low it creates a risk that this rivet will rupture?

A. That's not the only reason. Not just the coefficient of friction, but also the fact that this rivet has been subject to substantial amount of wear distortion, and this distortion didn't just come from anywhere.

Hahin Deposition, at 97-98.

Bauer's counsel also questioned Hahin about whether the Ladder was unreasonably dangerous:

Q. I just have one question. Maybe. Would you agree that it was negligent for a manufacturer to supply a ladder with one-quarter-inch steel roll-clinched rivets?
. . . .
A. My investigation specifically describes why I feel that the rivet failed. And I just feel that whenever this ladder was designed, these factors that I've outlined in the report should have been taken into account.

7

Q. Would you agree that the ladder as manufactured by Bauer was unreasonably dangerous for use on low-friction surfaces as a heavy-duty ladder?

. . . .

A. Okay. I feel that a ladder that would have an extra-duty, extra heavy-duty rating that would be placed on low-friction surfaces and be loaded to its maximum rated capacity could be subject to failure.

Q. If a ladder was subject to failure, would it be unreasonably dangerous for use on low-friction surfaces at weights approaching its rated capacity of 300 pounds?

. . . .

A. The basis of the ANSI standard for its load rating is predicated upon a certain frictional coefficient. So if you go below those levels which are stated in the standard, you're beyond, you're beyond an area where you'd want to consider the ladder to be safe.

Q. If the ladder is not safe, would it be unreasonably dangerous?

. . . .

A. The determination of whether it's safe is dependent on a lot of conditions, and those conditions determine whether the ladder's going to be safe or not. That's all I can say. I mean, the difficulty that I see with this particular ladder is that you have a safety standard which indicates yes, it's safe under these conditions and can stand these loads when you have controlled conditions, but if you do not have these controlled conditions which are not necessarily always established in industrial environments–in industrial environments you have wetness, you have oily surfaces, you may have less than ideal conditions. And then the ladder no longer is in a safe mode and is, there is a potential for failure.

Hahin Deposition, at 137-40.

Bauer's expert, Edwin G. Burdette, P.E., measured the coefficient of friction of a comparable Bauer ladder on a comparable dry steel grate. Burdette found the coefficient of friction for the ladder on the dry grate to be .45. Bauer Motion, Exhibit D, Deposition of Edwin G. Burdette (Burdette Deposition), at 20-22. Drabant's expert, Hahin, stated that he would not be surprised that the coefficient of friction would be .45 when the grate was dry. Hahin Deposition, at 106-07. Hahin did not attempt to measure the coefficient of friction of the Ladder on the grate. Id., at 38-40.

Burdette opined that, at a coefficient of .45, the friction between the feet of the Ladder and the dry grate was so great that the Ladder's legs would grip the grate and not tend to slip at all when Drabant climbed the Ladder. As a result, Burdette opined that no stress was put on the Rivet by Drabant climbing the Ladder. Bauer Motion, Exhibit C, Expert Report of Edwin G. Burdette dated October 30, 2008 (Burdette Report), at 3; Burdette Deposition, at 17-18. Hahin did not offer an opinion of the stress that would be placed on the Rivet if the grate was dry.

Burdette agreed with Hahin that the Rivet was already worn at the time of the incident. Burdette Deposition, at 13. Burdette, however, opined that the Rivet may have been worn because the Ladder had been

9

abused in the past by being "walked." He explained that "walking" a ladder occurs when the person who is on a ladder wants to move the ladder to a nearby location. Rather than getting off the ladder, moving the ladder, and then getting back on, the person twists and shakes the ladder while he stays on the ladder. The shaking and twisting cause the ladder to move, or "walk," to the desired location. The shaking and twisting, however, also cause stress on the ladder, including the rivets. Burdette stated that cracks in the Ladder's back support legs indicated that the Ladder had been walked. Burdette Deposition, at 12-14. Hahin stated that the Ladder had no unusual cracks in the legs. Hahin Deposition, at 136.

Burdette also opined that the Rivet failed after Drabant fell. Burdette opined that the most likely explanation for the incident was that Drabant just lost his balance on the Ladder and fell. Burdette stated that as Drabant fell, he must have kicked the spreader bar and the Rivet gave way. Drabant, however, stated that he heard the popping sound from the Rivet failing before he fell, and he did not kick the Ladder when he fell. Burdette Report, at 5; Drabant Response, Exhibit C, Affidavit of Mark Drabant.

## ANALYSIS

At summary judgment, Bauer must present evidence that

10

demonstrates the absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24 (1986). The Court must consider the evidence presented in the light most favorable to Drabant. Any doubt as to the existence of a genuine issue for trial must be resolved against Bauer. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986). Once Bauer has met its burden, Drabant must present evidence to show that issues of fact remain with respect to an issue essential to his case, and on which he will bear the burden of proof at trial. <u>Celotex Corp.</u>, 477 U.S. at 322; <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). In this case, Drabant has failed to present evidence on issues essential to both his products liability and his negligence claims.

To establish a products liability claim, Drabant must present evidence that: (1) a condition of the Ladder existed as a result of manufacturing or design, (2) the condition made the Ladder unreasonably dangerous, (3) the unreasonably dangerous condition existed at the time that the Ladder left Bauer's control, (4) Drabant was injured while using the Ladder, and (5) Drabant's injury was proximately caused by the unreasonably dangerous condition. <u>Mikolajczyk v. Ford Motor Co.</u>, 231 Ill.2d 516, 2008 WL 4603565, at *14 (Ill. 2008).

When viewed most favorably to Drabant, the evidence indicates that the selection of the Rivet to fasten the spacer bar may have created an unreasonably dangerous condition when the Ladder was used on low friction surfaces. Hahin opined that the Rivet would wear out prematurely if the Ladder was used on low friction surfaces with coefficients of friction at or below .175. This opinion creates an issue of fact regarding whether the selection of the Rivet to fasten the spacer bar to the Ladder's legs was a design defect that created an unreasonably dangerous condition in the Ladder at the time that the Ladder left Bauer's control.[3]

Drabant, however, has presented no evidence to show a causal connection between the design defect and his injury. Hahin opined that: (1) the Rivet would wear out prematurely if the Ladder was repeatedly used on low friction surfaces, (2) the Rivet was worn before Drabant climbed the Ladder, and (3) the Rivet finally gave way when Drabant climbed the Ladder on the wet, slippery grate. Drabant, however, presented no evidence

---

[3] Bauer argues that Drabant's expert must opine that the Ladder was unreasonably dangerous to a reasonable degree engineering certainty. See Baltus v. Weaver Div. Of Kidde & Co., 199 Ill.App.3d 821, 836, 557 N.E.2d 580, 589 (Ill.App. 1st Dist. 1990). When read favorably to Drabant, Hahin opined in his deposition to a reasonable degree of engineering certainty that Bauer's selection of the Rivet to fasten the spreader bar created an unreasonably dangerous condition if the Ladder was used on low friction surfaces.

that the grate was a low friction surface. Hahin assumed the grate was wet and slippery, but the evidence is directly contrary. Drabant stated that the area in which he set up the Ladder was dry. Furthermore, Burdette calculated the coefficient of friction between a comparable Bauer ladder on a comparable dry grate to be .45, and Hahin stated that he would not be surprised by that figure. A coefficient of friction of .45 is well above the low friction level of .175. Thus, the evidence before the Court shows that the Ladder was not set up on a low friction surface at the time of Drabant's fall. Therefore, the circumstances under which the selection of the Rivet created an unreasonably dangerous condition did not exist at the time of Drabant's fall.

Drabant also presented no evidence that prior wear on the Rivet was related to the use of the Ladder on low friction surfaces. In fact, Drabant has presented no evidence on how the Ladder was used. The evidence shows that the Ladder left Bauer's control in approximately 1996, and on February 5, 2006, the Rivet was worn and failed. That's it. Drabant has presented no evidence on the care and use of the Ladder for the ten years

13

from 1996 to 2006.  Thus, there is no way to tell why the Rivet failed.[4]  Hahin suggested that the Rivet could have failed because the Ladder was used repeatedly on low friction surfaces.  Burdette suggested that the Rivet was worn because users had misused the Ladder by walking it.  When viewed in the light most favorable to Drabant, the evidence does not support or eliminate either hypothesis, or eliminate any other reasonable alternative theory.[5]  Drabant, therefore, has not presented evidence that would tend to show that the claimed unreasonably dangerous condition in the Ladder (as opposed to misuse of the product) was the proximate cause of Drabant's injuries.  Without evidence of proximate cause, Drabant cannot overcome Bauer's request for summary judgment on the products liability claim.

Drabant argues that he has enough evidence to establish a products liability claim even if he cannot show that the defective design of the Rivet caused his injury.  Illinois allows plaintiffs to establish product liability

---

[4] Drabant argues that Burdette opined that the Ladder was in good condition. That is incorrect with respect to the Rivet.  Burdette and Hahin agreed that the Rivet was worn.

[5] Burdette cited cracks in the rails as evidence that the Ladder was walked.  Hahin stated that the rails had no unusual cracking.  For purposes of the Motion, the Court must assume Hahin was correct on this point.

claims by circumstantial evidence without proof of a specific defect. To establish a products liability claim in this manner, Drabant must present evidence that: (1) there was no abnormal use of the product; (2) there was no reasonable secondary cause of the injury; and (3) the product failed to perform in the manner reasonably expected in light of its nature and intended function. Weedon v. Pfizer, Inc., 332 Ill.App.3d 17, 22, 773 N.E.2d 720, 724 (Ill.App. 1st Dist. 2002). As explained above, Drabant has failed to present evidence showing how the Ladder was used for the ten years from 1996 to 2006. Without this information, the evidence does not support or eliminate any reasonable secondary cause for the failure of the Rivet, including walking the Ladder or any other reasonable possibility. Furthermore, the evidence presented shows that the steel grate on which Drabant set up the Ladder was not a low friction surface. Drabant has the burden at summary judgment to come forward with competent evidence that would negate other reasonable secondary causes. He has failed to do so. He, therefore, has failed to present evidence on every element on which he has the burden of proof at trial. Bauer is entitled to summary judgment on the products liability claim. Celotex Corp., 477 U.S. at 322.

   Drabant also fails to present evidence to support a claim for

negligence. To establish his negligence claim, Drabant must present evidence that: (1) Bauer deviated from the standard of care that other manufacturers in the industry followed at the time the Ladder was designed, or (2) Bauer knew or should have known, in the exercise of ordinary care, that the Ladder was unreasonably dangerous and Bauer failed to warn of its dangerous propensities. Blue v. Environmental Engineering, Inc., 215 Ill.2d 78, 97, 828 N.E.2d 1128, 1141 (Ill. 2005). Drabant has no evidence that Bauer breached the duty of care. Bauer designed and manufactured the Ladder to meet the published ANSI safety standards. In addition, every other ladder found by Drabant used the same or similar rivet design to attach spacer bars. None used the bolt and nut design suggested by Hahin. Hahin opined that the ANSI standard should be changed, but that does not show that Bauer breached a duty of care by following accepted safety standards in the industry. Drabant also has no evidence that Bauer knew that the Rivet created an unreasonably dangerous condition. Drabant also has presented no evidence of any failure to warn. Drabant has no evidence of a breach of duty.

    Drabant also has no evidence of proximate cause. As explained above, Drabant has evidence that the Rivet was worn and failed, but no evidence

16

on how the Ladder was used over the ten years after it left Bauer's control. Thus, Drabant has presented no evidence that the Rivet's failure was related to the use of the Ladder on low friction surfaces. Without such evidence, he cannot demonstrate proximate cause.

THEREFORE, Bauer Corporation's Motion for Summary Judgment (d/e 43) is ALLOWED. Judgment is entered in favor of Defendant Bauer Corporation and against Plaintiff Mark Drabant. All pending motions are denied as moot. This case is closed.

IT IS THEREFORE SO ORDERED.

ENTER: March 9, 2009

FOR THE COURT:

s/ Jeanne E. Scott
JEANNE E. SCOTT
UNITED STATES DISTRICT JUDGE